IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA,

v.

BENNY DESHAZER,

    Defendant.

CASE NO. 1:19-CR-00230-ELR-LTW

## FINAL REPORT AND RECOMMENDATION AND ORDER CERTIFYING THIS CASE READY FOR TRIAL

This matter is before the Court Defendant Benny DeShazer's Motions to Suppress statements.[1]  [Docs. 15, 16].  On January 14, 2020, the undersigned held an evidentiary hearing regarding the Motions.  [Docs. 25, 26].  After the hearing, Defendant filed an additional brief in support of the Motions ([Doc. 33]), the Government filed its Responses ([Doc. 35]), and Defendant replied ([Doc. 36]).  The Motions are ripe for consideration, and the undersigned **RECOMMENDS** that the Motions be **DENIED**.

---

[1] The Court granted the Government's request to hire an expert and obtain a psychological evaluation of Defendant.  [Docs. 58, 16].  Pursuant to the Government's request, a psychological evaluation was conducted and filed with the Court.  [Doc. 61, filed under seal].  The Court has confirmed with the Government and Defense Counsel that Defendant's competency is not in issue in this action.

## BACKGROUND

Defendant worked for the United States Postal Service from 1983 to 1997 when he suffered an on-the-job injury and began receiving worker's compensation benefits. See [Doc. 35-1]; see also [Doc. 26 at 22:2–3]. In 2007, Defendant retired from federal service under disability retirement, though he could have been required to return if his medical condition improved. See [Doc. 35-1]; see also [Doc. 26 at 24:4–20]. Defendant was required to submit annual assessments "from [his] doctor . . . to determine whether there is capacity to be reinstated." [Id. at 24:4–25:4]. Participation in that process is "mandatory" and "one consequence [of failing to participate] would be the loss of [disability] benefits." [Id. at 25:11–15]. If the Office of Workers' Compensation had "reasons to," they could follow up on an employee's assessment by ordering an "examination by a qualified physician." [Id. at 27:8–21].

In 2011, Special Agent ("SA") Derek Bigham began investigating Defendant because "the amount of opioids he was receiving was . . . leaps and bounds above [what] anyone else" was receiving, leading SA Bigham to believe "there was some sort of abuse, either trafficking or abusing and use." [Id. at 38:5–14]. In observing Defendant, SA Bigham saw Defendant driving, which contradicted his disability paperwork assert wherein he asserted that "he lived a sedentary lifestyle, he couldn't

drive, his wife drove him everywhere." [Id. at 39:14–25]. Believing that their investigation "had been compromised," the investigation of Defendant "laid dormant . . . until 2017." [Id. at 21:14–22:1]. In 2018, a pole camera captured Defendant driving, doing yard work, lifting and carrying a Christmas tree, loading children's bicycles into the back of his truck, unloading debris, fixing his garage, climbing a ladder, and working on his car. [Id. at 40:4–20].

As part of his investigation, SA Bigham sent Defendant a letter in November 2018 scheduling an interview for a quality assessment review (the "November 2018 Interview"). [Id. at 5:1–6:13]. As mentioned above, Defendant was required to submit annual certifications from his physician and could have been "compelled to be seen by a qualified physician." [Id. at 24:4–25:15, 29:7–10]. But the November 2018 Interview "was not medical in nature" and SA Bigham did not purport to be a doctor or pretend to be conducting a medical review. [Id. at 27:18–28:3; id. at 29:7–11]. Instead, SA Bigham posed as a "[q]uality assessment contractor" responsible for "assess[ing] the quality of case management that [Defendant had] gotten through the post office." [Id. at 29:18–24]. The letter sent to Defendant said the November 2018 Interview was "necessary to ensure proper case management review," but does not say Defendant's attendance is mandatory or suggest what consequences might occur if

Defendant failed to attend the interview.  [Defendant's Ex. 1].  SA Bigham testified that Defendant "wasn't compelled to come to the interview" and that Defendant could not "be compelled to answer questions" posed by SA Bigham.  [Id. at 28:21–29:6].

Defendant initially told SA Bigham "he didn't know if he could get [to the November 2018 Interview] because he didn't drive," but Defendant did eventually show up—using a walker.  [Id. at 6:17–7:4]; see also [id. at 10:13–15].  The interview took place in a conference room with tables set up in a u-shaped configuration.  [Id. at 8:14–17].  SA Bigham and a student intern sat at a table on one side of the room, and Defendant and his daughter sat across the table, near the exit.  [Id. at 8:18–9:17]; see also [id. at 8:10–13].  SA Bigham did not identify himself as law enforcement or show Defendant his law enforcement credentials, and he did not have a weapon in his possession during the November 2018 Interview.  [Id. at 9:25–10:7].  SA Bigham noted that Defendant did not appear under the influence of drugs or alcohol, was not lethargic or without energy, and was alert and able to sit up straight.  [Id. at 34:20–35:15].  SA Bingham told Defendant the purpose of the November Interview was to review Defendant's "current restrictions and determine[ ] if there were any limited or light-duty positions [he] could work within the post office to return back to work."  [Id. at 7:5–10].  While SA Bingham did want "to determine if there were any positions

4

available within the post office" for Defendant, the November 2018 Interview "was also to determine if [Defendant would] be truthful." [Id. at 7:11–8:5].

The interview consisted of SA Bigham asking Defendant about his physical limitations and having Defendant complete a written self-assessment form. See [id. at 11:25–12:21]. SA Bigham told Defendant he needed to be honest on the self-assessment and that the answers he gave would be used to determine whether he would continue to receive disability benefits. [Id. at 12:22–24]; [id. at 15:7–15]. Toward the beginning of the interview, SA Bigham told Defendant he would need to complete the self-assessment "today" but also indicated Defendant could "skip" providing certain information. [Government's Ex. 1 at 9:50–10:00]. When Defendant indicated he was not going "to put all this stuff" in response to a question, SA Bigham replied "that's fine." [Id. at 10:50–11:00]. In the self-assessment and in response to questions, Defendant stated that he could not drive, do yardwork or vehicle maintenance, and required an assistive device to ambulate. [Doc. 26 at 12:1–10]. Toward the end of the interview, when reviewing Defendant's written answers, SA Bigham noted that a response was unclear because a check mark was between two boxes, and so he asked if he could "get [Defendant] to" check the correct box. [Government's Ex. 1 at 47:25–47:40].

In June 2019, SA Bigham contacted Defendant a second time and asked him to meet at the same address where the November Interview took place. [Id. at 15:16–22]; see also [id. at 8:6–9]. Defendant arrived with his wife and daughter, and SA Bigham "explained to them what the situation was," telling them that Defendant had been indicted and was being placed under arrest. See [id. at 15:16–23]. SA Bigham took Defendant to a different room "and asked if he wanted to talk about the situation." [Id. at 15:23–16:1]. Defendant agreed to speak with SA Bigham, was read a Miranda[2] warning, and signed a form acknowledging that he understood his rights. [Id. at 16:1–11]. The June 2019 Interview lasted approximately 30 to 60 minutes. [Id. at 16:12–13]. During the interview, Defendant was not searched or restrained, and he did not ask for an attorney or attempt to stop the interview at any point. [Id. at 19:3–7]; see also [id. at 33:22–25]. After the June 2019 Interview, Defendant rode with his wife and daughter in his own car to the courthouse, where he was transferred into the Marshals' custody. [Id. at 16:22–17:10].

## LEGAL ANALYSIS

Relying on Garrity,[3] Defendant first argues the November 2018 Interview

---

[2] Miranda v. Arizona, 384 U.S. 436 (1966).
[3] Garrity v. New Jersey, 385 U.S. 493 (1967)

6

violated his Fifth Amendment rights because he was compelled to answer SA Bigham's questions with the threat that Defendant would lose his disability benefits if he did not. [Doc. 33 at 6–17]. Defendant then contends that the June 2019 Interview must also be suppressed because the November 2018 Interview "taint[ed] [his] subsequent consent" to speak with SA Bigham. [Id. at 17–19]. The undersigned addresses each argument in turn.

### A.   The November 2018 Interview

As a general rule, "the Fifth Amendment protection against self-incrimination is not self-executing." United States v. Vangates, 287 F.3d 1315, 1320 (11th Cir. 2002). Instead, a person "must assert that right specifically," and his answers are only considered to be "compelled within the meaning of the Fifth Amendment [if he] is required to answer over his valid claim of privilege." Id. (quoting Minnesota v. Murphy, 465 U.S. 420, 427 (1984)). The most famous exception to this rule is Miranda, where the Supreme Court held that the "Fifth Amendment privilege against self-incrimination [requires] law enforcement authorities to advise a person subject to custodial interrogation of certain rights." United States v. Bernal-Benitez, 594 F.3d 1303, 1318 (11th Cir. 2010); see also United States v. Adams, 1 F.3d 1566, 1575 (11th Cir. 1993) ("Miranda 'warnings are required before any statement may be admitted

7

into evidence at trial which was elicited from a person in custody through interrogation.'") (quoting Endress v. Dugger, 880 F.2d 1244, 1248 (11th Cir. 1989).

Defendant was not "in custody" when he spoke with SA Bigham during the November 2018 Interview, and thus he does not rely on Miranda to argue those statements should be suppressed. Rather, Defendant relies on another line of cases beginning with Garrity that—like Miranda—apply in rare situations where "the Fifth Amendment is considered 'self-executing,' and an individual need not expressly invoke the right [to remain silent] for his statements to be suppressed in a later criminal proceeding." McKathan v. United States, 969 F.3d 1213, 1224 (11th Cir. 2020). Contrary to the Government's suggestion, Garrity does not only "protect[ ] public employees against the threat of termination from employment." See [Doc. 35 at 8]. Garrity was just the first in the line of "so-called 'penalty' cases," which collectively "make clear that 'a State may not impose substantial penalties because a witness elects to exercise his Fifth Amendment right not to give incriminating testimony against himself.'" Minnesota v. Murphy, 465 U.S. 420, 434–35 (1984) (quoting Lefkowitz v. Cunningham, 431 U.S. 801, 805 (1977)).

The cases are specific examples of the broader principle that a defendant's statements are inadmissible if "the circumstances show that 'coercive police activity'

overcame the defendant's free will." See Arvelo v. Sec'y, Fla. Dep't of Corr., 687 F.

App'x 901, 904 (11th Cir. 2017) (quoting Colorado v. Connelly, 479 U.S. 157, 163–

64 (1986)); see also Murphy, 465 U.S. at 434 ("The general rule that the privilege must

be claimed when self-incrimination is threatened has also been deemed inapplicable in

cases where the assertion of the privilege is penalized so as to foreclose a free choice

to remain silent, and compel incriminating testimony." (quotation marks and alterations

omitted).  Law enforcement cannot compel a person to answer questions with threats

of severe economic sanctions just like they cannot compel a person to answer questions

with threats of physical violence.

The Government disputes whether Defendant was "a public employee" and

whether he was "threatened with employment termination," but the dispute is largely

irrelevant. See [Doc. 35 at 7–8].  The principles of Garrity apply regardless of whether

the threatened individual is a public employee.  Lefkowitz v. Turley, 414 U.S. 70, 83

(1973) ("We fail to see a difference of constitutional magnitude between the threat of

job loss to an employee of the State, and a threat of loss of contracts to a contractor.").

And they can apply regardless of whether the individual is threatened with "losing his

job." Id. 414 U.S. at 83–84 ("An architect lives off his contracting fees as surely as a

state employee lives off his salary, and fees and salaries may be equally hard to come

by in the private sector after sanctions have been taken by the State."). The undersigned assumes without deciding that the possible loss of disability benefits is the kind of "substantial penalt[y]" that can trigger Garrity because, as Defendant argues, the benefits "served as a substitute for [Defendant's] salary. See Cunningham, 431 U.S. at 805; see also [Doc. 33 at 9].

The question then is: Was Defendant threatened with a loss of his benefits if he did not answer SA Bigham's questions during the November 2018 Interview? Murphy, 465 U.S. at 435 ("The threat of punishment for reliance on the privilege distinguishes cases of this sort from the ordinary case in which a witness is merely required to appear and give testimony."). Because Defendant does not contend he was explicitly threatened with economic sanctions, the Court employs "a two-part analysis that examines whether [he] subjectively believed that he would suffer an adverse employment action if he did not answer questions and whether that subjective belief was objectively reasonable." See [Doc. 33 at 14]; see also Vangates, 287 F.3d at 1321–22 ("In the absence of a direct threat, we determine whether [a person's] statements were compelled by examining her belief and, more importantly, the objective circumstances surrounding it.").

Defendant argues he subjectively believed he was being threatened with a loss of benefits because he was told (1) he "would need to come in for a review to determine if there were any limited or light duty jobs available," (2) "he had to respond honestly to the questions," and (3) "his answers would be used to determine if he would continue to collect [disability] benefits." [Doc. 33 at 15]. None of these facts, however, show Defendant had a *subjective* belief that he would lose his benefits if he failed to answer SA Bigham's questions.

Because Defendant never "received the letter" telling him to come in for a review, he cannot rely on that letter to argue about his subjective beliefs. See [Doc. 26 at 6:3–22]. Moreover, the letter contains no threat, express or implied, that Defendant's benefits would be terminated if he missed the meeting. See [Defendant's Ex. 1]. To be sure, it was "mandatory" that Defendant submit annual assessments "from [his] doctor . . . to determine whether there is capacity to be reinstated," and a failure to participate could result in the loss of disability benefits. [Doc. 26 at 24:4–25:15]. But the November 2018 Interview "was not medical in nature" and SA Bigham did not purport to be a doctor or pretend to be conducting a medical review. [Id. at 27:18–28:3; id. at 29:7–11]. Instead, SA Bigham posed as a "[q]uality assessment contractor" responsible for "assess[ing] the quality of case management that [Defendant had]

11

gotten through the post office." [Id. at 29:18–24]; see also [Defendant's Ex. 1]. SA Bigham testified that Defendant "wasn't compelled to come to the interview," and there is no evidence to the contrary. [Doc. 26 at 28:21–24].

Even if attendance at the November 2018 Interview had been "mandatory," that would not suffice to show Defendant's Fifth Amendment rights were violated. The mere fact that a defendant "was under legal compulsion to attend [a] meeting and to answer truthfully the questions of [an] officer who anticipated incriminating answers" does not, standing alone, trigger Garrity. See Murphy, 465 U.S. at 437. And the fact that those answers would be used to determine Defendant's eligibility for disability benefits likewise does not trigger Garrity. See Murphy, 465 U.S. at 435 ("A state may require a probationer to appear and discuss matters that affect his probationary status; such a requirement, without more, does not give rise to a self-executing privilege."). What is prohibited is telling a person that he is "required to choose between making incriminating statements and jeopardizing [his entitlement to benefits] by remaining silent." See id. at 436.

SA Bigham did not take that "extra, impermissible step." See id. SA Bigham simply told Defendant he "had to respond honestly to the questions" and that "his answers would be used to determine if he would continue to collect [disability]

benefits." See [Doc. 33 at 15]; see also [Doc. 26 at 7:5–10, 12:22–24, 15:7–15]. Such statements, standing alone, are insufficient to trigger Garrity because they do not contain an explicit or implicit threat that Defendant will be subjected to economic sanctions for choosing to remain silent when asked questions. Murphy, 465 U.S. at 435–37.

Looking to the factors discussed by the Supreme Court in Murphy, there is no indication Defendant had a subjective belief he was required to answer SA Bigham's questions or have his benefits taken away. First, there is no "direct evidence" of such a subjective belief because Defendant did not testify during the suppression hearing. See Murphy, 465 U.S. at 437. Second, there is no evidence Defendant was expressly informed in person that he would be penalized for choosing not to answer questions. See id. at 437–38. And third, during the November 2018 Interview, Defendant was told he could "skip" certain portions of the self-assessment and that it was "fine" if he did not completely answer every question, which "strongly suggests" Defendant did not believe he was under any "threat" for not answering fully. [Government's Ex. 1 at 9:50–10:00, 10:50–11:00]; see also Murphy, 465 U.S. at 438. Defendant did not "express[ ] any reservations" about answering SA Bigham's questions, and he demonstrated "he was capable of declining [SA Bigham's] requests for information as

13

illustrated by his refusal to" answer all of the questions completely.  United States v. Ramos, 685 F.3d 120, 129 (2d Cir. 2012).

More importantly, there is no objective evidence Defendant was prohibited from exercising his right to remain silent.  Again, there is no evidence that the November 2018 Interview itself was "mandatory."  See [Doc. 26 at 28:21–24].  Even assuming it was, being "under legal compulsion to attend [a] meeting and to answer truthfully the questions of [an] officer who anticipated incriminating answers" does not trigger Garrity on its own.  see also Murphy, 465 U.S. at 437.  What matters is whether Defendant was compelled to answer SA Bigham's particular questions or face substantial economic consequences.  Defendant was not.

As mentioned above, SA Bigham told Defendant he could "skip" certain portions of the self-assessment and that it was "fine" if he did not completely answer every question.  [Government's Ex. 1 at 9:50–10:00, 10:50–11:00].  Defendant perhaps could have been compelled "by a qualified physician," but the November 2018 Interview "was not medical in nature" and SA Bigham did not purport to be a doctor or pretend to be conducting a medical review.  [Doc. 26 at 27:18–28:3; id. at 29:7–11].  Instead, SA Bigham explicitly testified that Defendant could not "be compelled to answer questions" during the November 2018 Interview.  [Id. at 29:3–6]; see also [id.

14

at 28:21–29:2].  There is no evidence in the record suggesting Defendant would have had his benefits terminated if he refused to answer any of SA Bigham's questions; and thus, even if Defendant had a subjective belief he would be so penalized, his belief was not objectively reasonable.  See Vangates, 287 F.3d at 1324 ("The general directive to cooperate was not sufficiently coercive to create an objectively reasonable belief that Vangates would be sanctioned if she invoked her Fifth Amendment rights.").  Because Defendant was not "compelled to incriminate himself" and he did not "timely assert[ ] his Fifth Amendment privilege" during the November 2018 Interview, he cannot "successfully invoke the privilege to prevent the information he volunteered to [SA Bigham] from being used against him in a criminal prosecution."  See Murphy, 465 U.S. at 440.

As a final matter, Defendant seems to suggest that his answers to SA Bigham's questions during the November 2018 Interview were not "voluntary in any true sense" for reasons that go beyond Garrity.  [Doc. 33 at 16–17].  For example, Defendant asserts he was "likely" under the influence of a high amount of opiates during the interview, but there is no evidence to support that position.  [Id.].  To the extent that Defendant is relying on SA Bigham's testimony to support his assertion, Defendant's representation is inaccurate.  SA Bigham did not testify he "had no reason to doubt that

[Defendant] was following his doctor's orders," as Defendant argues.  See [id. at 17]. Quite the opposite.

When asked if he had "any reason to believe that [Defendant] wasn't taking opiates that were prescribed by his doctor," SA Bigham replied, "Not as a medical professional."  [Doc. 26 at 36:20–22].  SA Bigham immediately went on to say he "had spoken with an agent who was a nurse," and that the nurse told SA Bigham "if [Defendant] were actually taking all of those medicines, he would be really probably [sic] comatose."  [Id. at 36:22–37:2].  Because SA Bigham "had seen [Defendant] functioning for months," he determined "it wasn't consistent with the idea he had been taking those medicines."  [Id. at 37:3–12].  More to the point, SA Bigham testified that during the November 2018 Interview Defendant did not appear under the influence of drugs or alcohol, was not lethargic or without energy, and was alert and able to sit up straight.  [Id. at 30:22–31:1]; [id. at 34:20–35:15].  The undersigned has reviewed the recording of the interview and agrees.  There is no evidence Defendant was under the influence of a large amount of opiates during the interview, as he tries to suggest.  See [Doc. 33 at 16–17].

Defendant also repeatedly suggests his statements were involuntary because the November 2018 Interview was a ruse.  See [id. at 13, 16–17].  Defendant's suggestion

that SA Bigham's "subterfuge was intended to avoid the constitutionally mandated necessity of providing [Defendant] with the appropriate <u>Garrity</u> warnings" falls short. <u>See</u> [Doc. 36 at 7–8]. The use of a ruse has no impact on whether Defendant was entitled to a <u>Garrity</u> warning. Because Defendant necessarily did not know he was being investigated by law enforcement, the ruse had no impact on Defendant's subjective belief regarding whether his answers could be compelled. Also, because of the nature of the ruse, SA Bigham could not—and did not—use his authority as a law enforcement agent to try to compel Defendant to answer questions. As discussed above, Defendant did not have any basis for believing a "[q]uality assessment contractor"—the role SA Bigham pretended to have—could compel him to answer any questions. <u>See</u> [Doc. 26 at 29:18–20]; <u>see</u> [<u>id</u>. at 28:21–29:11]. Based on the record before the Court and applicable law, that SA Bigham was engaged in a ruse does not change the analysis because there was no subjective or objective reason for Defendant to believe SA Bigham could or would revoke Defendant's disability benefits if Defendant chose not to answer SA Bigham's questions.

To the extent Defendant suggests he "needed to be told that this was actually a law enforcement interview" for his statements to be voluntary, his argument is contrary to Supreme Court authority. <u>See</u> [Doc. 36 at 4]. "Coercion is determined from the

perspective of the suspect." Illinois v. Perkins, 496 U.S. 292, 296 (1990). When a suspect is tricked into speaking with undercover agents, those conversations lack the "inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely." See id. at 296 (quoting Miranda, 384 U.S. at 467). The fact that Defendant did not know of the criminal investigation means Defendant did not have any reason to feel coerced by SA Bigham's true authority as a law enforcement agent. Perkins, 496 U.S. at 296–97 ("There is no empirical basis for the assumption that a suspect speaking to those whom he assumes are not officers will feel compelled to speak by the fear of reprisal for remaining silent or in the hope of more lenient treatment should he confess.").

Looking at the totality of the circumstances, there is no basis for concluding that Defendant's statements during the November 2018 Interview were involuntary. The interview lasted less than an hour. See United States v. Salman, 286 F Supp. 3d 1325, 1351 (M.D. Fla. 2018) (finding no coercive conduct, "notwithstanding the 5.5 hours of questioning"). SA Bigham had only an intern with him and, because of the ruse, did not have a firearm on him or show Defendant a badge. See United States v. Espinosa-Orlando, 704 F.2d 507, 510, 513 (11th Cir.1983) (concluding consent was voluntary after four officers had drawn their weapons, asked the defendant to step away from his

car, told him to lie on the grass, and asked for consent while he was on the ground and one officer still had his weapon drawn). And as discussed above, Defendant did not have an objective or subjective basis for believing his answers could be coerced through economic sanctions. Thus, Defendant's Motions to Suppress should be **DENIED** to the extent he seeks to suppress his statements during the November 2018 Interview.

### B. The June 2019 Interview

Defendant also argues his statements during the June 2019 Interview should be suppressed because "the coercive ruse interview [in November 2018] taint[ed] [his] subsequent consent." [Doc. 33 at 18]. As discussed above, the November 2018 Interview was not impermissibly coercive, and thus Defendant's statements during the June 2019 Interview are not subject to "suppression as the fruits of the initial illegality," like Defendant suggests. See [id.]. Other than suggesting his June 2019 Interview "was causally connected to the covert stratagem utilized to deprive [him] of his constitutional rights in November [2018]," Defendant offers no other reason why his "post-arrest statement[s] must also be suppressed." See [id. at 18–19]; see also [Doc. 36]. Even if Defendant's November 2018 Interview statements were subject to

suppression, the undersigned would still recommend that the Motions to Suppress be denied as to the June 2019 Interview statements.

If Defendant's November 2018 Interview statements had been illegally coerced, the June 2019 Interview statements would be excluded "unless intervening events break the causal connection between the illegal arrest and the confession so that the confession is 'sufficiently an act of free will to purge the primary taint.'" Taylor v. Alabama, 457 U.S. 687, 690 (1982) (quoting Brown v. Illinois, 422 U.S. 590, 602 (1975)). The admissibility of Defendant's June 2019 Interview statements would depend upon whether the statements were acquired "by the exploitation of the illegality or instead by means sufficiently distinguishable to be purged of the primary taint." Wong Sun v. United States, 371 U.S. 471, 487–88 (1963). In determining if subsequent statements are subject to suppression, Courts consider a variety of factors, including "[t]he temporal proximity of the arrest and confession, the presence of intervening circumstances . . . and, particularly, the purpose and flagrancy of the official misconduct." Brown, 422 U.S. at 603–04 (footnotes and citations omitted). It is also relevant, but not determinative, whether Miranda warnings were administered prior to the confession. Id.; Taylor, 457 U.S. at 690.

Here, Defendant acknowledges "the temporal connection [between his interviews with SA Bigham] is somewhat displaced." [Doc. 33 at 17]. Defendant is correct. Seven full months elapsed between the November 2018 Interview and the June 2019 Interview. <u>See</u> [Doc. 26 at 3:11–12]. Defendant points to no authority, and the Court can find none, holding that suppression is warranted where "the temporal connection" between the interviews at issue is so extremely "displaced." <u>See</u> [Doc. 33 at 17–19]. A lapse of a few days between the unlawful activity and a defendant's subsequent statements is usually enough to "dissipate the taint" of the initial illegality. <u>See</u> <u>Wong Sun</u>, 371 U.S. at 491 (holding that the defendant's statements "several days" after his arrest were not subject to suppression); <u>Devier v. Zant</u>, 3 F.3d 1445, 1459 (11th Cir. 1993) (<i>per curiam</i>) (holding that "any taint from [the defendant's unlawful] detention . . . had been completely attenuated by the time of his eventual confession four days later"); <u>cf.</u> <u>Taylor</u>, 457 U.S. at 691 (holding that the defendant's confession was involuntary even though "the length of time between the illegal arrest and the confession was six hours" because the defendant "was in police custody, unrepresented by counsel, and he was questioned on several occasions, fingerprinted, and subjected to a lineup" during those six hours).

While not determinative, the fact Defendant was given a <u>Miranda</u> warning before he made the June 2018 Interview statements is "an important factor" indicating his statements were not tainted by the November 2018 Interview. <u>Brown</u>, 422 U.S. at 603. And perhaps the most important factor of all, "the purpose and flagrancy of the official misconduct," weighs in the Government's favor. <u>See id</u>. at 603–04. As discussed above, there was no misconduct during the November 2018 Interview. But even if Defendant did subjectively believe he was being forced to answer SA Bigham's questions and even if his belief was reasonable, there is no evidence that SA Bigham *intended* to coerce Defendant with any threats. SA Bigham testified that he believed Defendant "wasn't compelled to come to the interview" and that Defendant could not "be compelled to answer any questions." [Doc. 26 at 28:21–29:6]. SA Bigham's purpose for the November 2018 Interview "was also to determine if [Defendant would] be truthful," not to unlawfully force him to make statements. <u>See</u> [Doc. 26 at 7:11–8:5]. While Defendant derides the November 2018 Interview as a "ruse," the "use of undercover agents is a recognized law enforcement technique." <u>Perkins</u>, 496 U.S. at 300.

In sum, Defendants statements during the June 2019 Interview are not subject to suppression because the November 2018 Interview was not unlawful. Even if it were,

the June 2019 Interview was purged of any illegal taint due to the incredible length of time that had elapsed, the fact that Defendant was read a <u>Miranda</u> warning before the June 2019 Interview, and the fact that the November 2018 Interview was neither a purposeful nor flagrant act of misconduct.  <u>See</u> <u>Brown</u>, 422 U.S. at 603–04.  To the extent Defendant seeks suppression of his statements during the June 2019 Interview, his Motions to Suppress should be **DENIED**.

## CONCLUSION

For the foregoing reasons, the undersigned **RECOMMENDS** that Defendant's Motions to Suppress ([Docs. 15, 16]) be **DENIED**.  There are no other pending matters before the Magistrate Judge, and the undersigned is aware of no problems relating to the scheduling of this case.  **IT IS FURTHER ORDERED** and **ADJUDGED** that this action be and the same is hereby, declared Ready for Trial.

**SO ORDERED, REPORTED, AND RECOMMENDED**, this  23  day of July, 2021.

LINDA T. WALKER
UNITED STATES MAGISTRATE JUDGE

23